## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**REBECCA E. SCHROEDER**                                      **PLAINTIFF**

**v.**                                                **CAUSE NO. 1:25cv93-LG-RPM**

**MISSISSIPPI DEPARTMENT**
**OF HUMAN SERVICES**                                        **DEFENDANT**

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rebecca E. Schroeder filed this Title VII lawsuit claiming that she

was terminated by the Mississippi Department of Human Services ("MDHS")

because of her race (Caucasian).  MDHS has filed a [30] Motion for Summary

Judgment, which has been fully briefed by the parties.  After reviewing the

submissions of the parties, the record in this matter, and the applicable law, the

Court finds that the Motion [30] should be granted, and this case dismissed with

prejudice, because Schroeder has not pointed to competent summary judgment

evidence sufficient to create any genuine issue of material fact.

### BACKGROUND

MDHS[1] hired Schroeder in July 2010.  Over the next nine years, she received

multiple promotions, eventually becoming the Economic Assistance Eligibility

("EAE") Division's County Director for Harrison County, Mississippi.  She applied

---

[1] MDHS is a Mississippi agency that oversees several public assistance programs, including the Supplemental Nutrition Program and the Temporary Assistance for Needy Families program.  *See* Miss. Code Ann. § 43-1-2(5); § 43-1-29.1; § 43-1-30.

for the Region 8[2] Regional Director position in July 2023.  MDHS Deputy Executive

Director for Economic Programs Shenetta Drone (African American), Division

Director for the MDHS EAE Division Kristi Kinnel (African American), and the

MDHS Division of Early Childhood Care and Development Director Chad Allgood

(Caucasian) interviewed three applicants for the position: Schroeder, MDHS

Benefits Specialist Denise Henderson (African American), and the acting Hancock

County Director Ziva Fox (African American).  McDonald Decl. [30-1] at 2.  After

the first round of interviews, Schroeder and Fox scored the highest, so they were

selected as finalists for a second interview.  Drone and MDHS Executive Director

Robert G. Anderson (Caucasian) conducted the second round of interviews before

selecting Schroeder for the position.  Anderson testified that both Schroeder and

Fox were "well qualified," so he deferred to Drone and allowed her to make the

decision.  Drone testified:

> Ultimately, between the two, the question that I asked myself in
> making the decision is what did that region need the most, because the
> position had been vacant so long and some of the challenges that were
> happening in that region.  And it was, did the region need someone
> who would be more personable and engaging, which I saw in Ms. Fox,
> or did the region need someone who would be more structured, and
> that's what I saw in Ms. Schroeder.  And so, ultimately, I did decide or
> select Ms. Schroeder.

Drone Dep. [35-2] at 11–12.

Drone told Schroeder that Schroeder would be an at-will employee if she

---

[2] Region 8 "includes EAE county offices in George, Hancock, Harrison, Jackson, Pearl River and Stone counties."  McDonald Decl. [30-1] at 2.

accepted the Regional Director position.[3]  Drone Dep. [35-2] at 40.  She also informed Schroeder that her immediate supervisor would be Kinnel.  *Id.*  Drone was aware that Kinnel did not like Schroeder, but she did not tell Schroeder that.  *Id.* at 40–41.  Drone does not believe that Kinnel's dislike of Schroeder was based on race.  *Id.* at 51.  Kinnel told Drone that Schroeder "got on her nerves[.]"  *Id.* at 40.  Drone believes that Schroeder was aware of Kinnel's dislike for her.  *Id.* at 41.

Schroeder accepted the Regional Director position effective December 5, 2023.  She also continued to serve as the Harrison County Director.  On January 23, 2024, Kinnel asked Schroeder to deliver a Notice of Suspension with Pay to a Caucasian female, Johna Necaise.  Schroeder testified that Necaise asked her why she was being suspended, and Schroeder responded that she did not know.  She said, "I was told to stay away from Hancock County, so I don't know what this is about.  I'm just following the direction of my supervisor."  Pl.'s Dep. [35-1] at 63.  Schroeder also told Necaise "to make sure that she did not enter any DHS property or locations or anything unless she received permission from State office.  And that -- also told her about the appeals process in the personnel handbook."  *Id.*  Necaise became very upset and cried, so Schroeder "showed sympathy to her by, just, you know, saying, 'I don't know what's going on.  You know, I don't have any answers for you.  But, you know, you've got the appeals process, and that's what you need to do."  *Id.* at 64.

---

[3] It is unclear whether Drone made these statements to Schroeder before or after Schoeder was offered the Regional Director position.  Schroeder made allegations about a conversation with Drone in her Complaint, but she has not given any sworn testimony about statements made by Drone.  *See* Compl. [1] at 3.

She also gave Necaise time to calm down before leaving the office.  She estimated that the meeting with Necaise lasted about fifteen minutes.

However, after the meeting, Necaise allegedly called another MDHS employee, Mary Cunningham, to tell her that Schroeder had speculated about the reason for Necaise's suspension and speculated about which MDHS employees were behind Necaise's suspension.  Necaise also claimed that Schroeder had given her other advice about appealing the suspension.  Cunningham made notes about her conversation with Necaise, which she provided to Fox.  Cunningham's statements about the conversation with Necaise ultimately reached Kinnel, who was Schroeder's supervisor.

In late January or early February 2024, MDHS's Chief Information Officer Mark Allen told Maureen McDonald (Caucasian), MDHS's Deputy Executive Director for Human Capital and Technology,[4] that Schroeder had falsely reported technical issues while she was serving as County Director.  McDonald Decl. [30-1] at 2–3; Allen Dep. [35-7] at 18.  Mr. Allen believed that Schroeder and other Harrison County employees often blamed technical issues for missed deadlines. McDonald Decl. [30-1] at 2–3; Allen Dep. [30-1] at 19.

On January 26, 2024, McDonald, Drone, and Kinnel met to discuss the

---

[4] McDonald supervised MDHS's Human Resources Division, Management Information Systems Division, and Safety and Emergency Services Division. McDonald Decl. [30-1] at 1.  She is "also the designee for MDHS Executive Director, Robert G. Anderson . . . (Caucasian), to make final decisions on his behalf regarding disciplinary matters for all agency personnel." *Id.*

investigation related to Necaise's suspension.[5]  During that meeting, Kinnel reported that she had "met with Ms. Schroeder via Microsoft Teams regarding hand delivery of the suspension notice to Johna Necaise."  McDonald Decl. [30-1] at 3. Kinnel stated that she instructed Schroeder to deliver the notice to Necaise, to collect all MDHS property that was in Necaise's possession, "and to only communicate that she may contact HR if Ms. Necaise had any questions."  *Id.* However, Kinnel advised that "she had received multiple reports [during] the following days that Ms. Schroeder had not handled the suspension with pay as instructed and instead spoke at length with Ms. Necaise about her suspension with pay."  *Id.*[6]  Kinnel provided a copy of the statement that Cunningham had given regarding her initial telephone call with Necaise.

McDonald explained:

Based on my review of the presented information, I determined that Ms. Schroeder's suspension with pay notice delivery and handling infraction was not in accordance with the instructions provided to her and in violation of MDHS agency practice and standard operating procedures for handling disciplinary actions, that Ms. Schroeder had conducted herself in a manner lacking the professionalism and discretion expected of her MDHS Regional Director position, which constituted direct insubordination and put that agency at serious risk with her handling of a disciplinary matter and made a volatile situation even worse.  In considering the request, I relied both on the

---

[5] McDonald testifies that Economic Programs' Counsel Deanisha Hopson and Employee Relations Specialist Lacy Anderson were also present at this meeting, but Drone testified that only she, McDonald, and Kinnel were present.

[6] McDonald explained that she "had developed and implemented standard operating procedures for MDHS employees and leadership to follow for handling disciplinary action, which were in effect and practiced at the agency during the time at issue in late 2023 through 2024."  McDonald Decl. [30-1] at 2.  These procedures "were later reduced to writing" soon after Schroeder's termination.  *See id.*

> seriousness of Ms. Schroeder incorrectly handling the suspension with pay and also on the report from Mr. Allen related to her falsely claiming there were technological issues in order to push off the blame for not timely completing her work.  I consider both of these to be terminable offenses, especially given the level of Ms. Schroeder's position in the agency at the time.  Also the fact that they were separate incidents that were reported by two different high-level individuals within the agency gave further credence to the matter.

*Id.* at 3–4.  She further explained, "On January 26, 2024, after careful consideration, I decided that the agency should terminate Ms. Schroeder.  Ms. Drone and I both agreed upon Ms. Schroeder's termination, and I ultimately approved and made the final decision to terminate Ms. Schroeder without any input or participation by any other employee." *Id.*

Drone stated, "Ms. McDonald shared with me what had been reported to her, and that was that during the delivery that Ms. Schroeder was giving specific instructions about how to or what to do when delivering a notice of suspension, and that she did not follow those instructions." *Id.* at 21.  Drone understood that Schroeder "was instructed to not have communication except for here's your letter, notice of suspension.  I need your keys, your badge, any MDHS property." *Id.* at 23.  Although Kinnel's email transmitting the notice of suspension to Schroeder did not address what Schroeder was permitted to say to Necaise, Drone explained that she believed Kinnel's representation that she had given those additional instructions to Schroeder because:

> it is customary to contact the person that we're asking to do it by phone, partly to assess their comfort level with delivering it so that we can determine if we need to ask one of our officers with our office of inspector general to do the delivery.

*Id.* at 29.  As a result, Drone believes that Kinnel gave Schroeder additional instructions during that customary phone call.  *Id.* at 32–33.

Based on McDonald's recommendation, Drone gave "the directive to move forward with the termination or recommending termination."  *Id.* at 13.  Drone did not learn about Allen's allegations against Schroeder until February, after Schroeder's termination.  *Id.* at 34.  Drone believes that McDonald knew about Allen's allegations prior to Schroeder's termination, but McDonald did not disclose that information to Drone until the month following Schroeder's termination.  *Id.* at 35–36.  McDonald testified that she planned to report that information to Drone earlier "but other matters intervened."  McDonald Decl. [30-1] at 3.  She explained, "During that time, there was an ongoing investigation into staff in the Hancock County office, Johna Necaise, which resulted in the need for Ms. Necaise to be suspended with pay while the investigation was concluded and a predisciplinary hearing was held."  *Id.*

McDonald signed the notice of termination provided to Schroeder "on behalf of and with authority from the Executive Director, Anderson[.]"  McDonald Decl. [30-1] at 4; Pl's Resp., Ex. 9 [35-9].  McDonald said that Kinnel "was directed to document the termination via a standard non-state service termination request[.]"  McDonald Decl. [30-1] at 4; *see also* Pl.'s Resp. [35-13] at 13.

After Schroeder's termination, MDHS announced that the Region 8 Regional Director position was open.  "[A] pool of candidates applies and were interviewed for the position, including Ms. Fox."  McDonald Decl. [30-1] at 4.  Fox received the

highest score from the interview panel, who voted to select her for the position.  She began working as Regional Director on March 1, 2024.

Kinnel was terminated by MDHS in approximately 2025.  *See* Drone Dep. [35-2] at 34.  Anderson made the decision.  *Id.*  An EEOC investigation of Kinnel's termination was pending when Anderson was deposed in this matter.  Anderson Dep. [35-5] at 9.  McDonald was also involved in the decision to terminate Kinnel. *Id.* at 16.  Anderson testified that Kinnel was terminated because "she was not able to run [the EAE] division."  *Id.* at 17.

Schroeder filed an EEOC charge on February 29, 2024, and the EEOC provided her with notice of her right to sue on January 27, 2025.  She filed this lawsuit on March 28, 2025.  MDHS now seeks summary judgment.

## DISCUSSION

### I.    WHETHER MDHS RELIES ON INADMISSIBLE EVIDENCE TO SUPPORT ITS MOTION FOR SUMMARY JUDGMENT

Schroeder argues that the following evidence and testimony submitted by MDHS contains inadmissible hearsay: (1) the deposition testimony of Mark Allen (exhibit H); (2) the declaration of Maureen McDonald (exhibit A); (3) a January 24, 2024, email chain (exhibit K); and (4) the deposition testimony of Shenetta Drone (exhibit E).

In response to a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, "[a]t the summary judgment stage, evidence relied upon need not be presented in admissible form, but it must be capable of being presented in a form that would be admissible in evidence." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) (citation modified). "Neither legal conclusions nor statements made without personal knowledge are capable of being so presented." *Id.* (citing Fed. R. Evid. 602, 701, 702).

"Hearsay is not admissible if offered solely for the truth of the matter asserted unless it is defined as non-hearsay or falls within an exception." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 775 (5th Cir. 2009). "Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener." *United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018).

### A.    MCDONALD'S DECLARATION

Schroeder argues that the following statements from paragraph 15 of McDonald's declaration constitute hearsay within hearsay pursuant to *Hager v. Brinker Tex., Inc.*, 102 F.4th 692 (5th Cir. 2024):

> Kinnel instructed Ms. Schroeder to provide the suspension with pay notice and collect her MDHS property (badge, keys, etc.) and to only communicate that she may contact HR if Ms. Necaise had any questions. Ms. Kinnel then advised that she had received multiple reports the following days that Ms. Schroeder had not handled the suspension with pay as instructed and instead spoke at length with Ms. Necaise about her suspension with pay. In particular, a statement was provided by Mary Cunningham on January 24, 2024 about her phone conversation with Ms. Necaise describing the suspension with pay notice delivery.

McDonald Decl. [30-1] at 3.  For context, McDonald goes on to say:

> Ms. Cunningham provided her statement to Ms. Fox (acting Hancock County Director), which Ms. Fox forwarded to EAE leadership and division counsel, including EAE Division Director, Ms. Kinnel, and Economic Programs counsel, Ms. Hopson.  A true and correct copy of Ms. Cunningham's statement which was reviewed is attached hereto and incorporated herein as Exhibit "4."  Upon reviewing this information, Ms. Drone verbally requested disciplinary action be taken against Ms. Schroeder based on her infraction in handling the disciplinary notice delivery.
>
> 16.  Based on my review of the presented information, I determined that Ms. Schroeder's suspension with pay notice delivery and handling infraction was not in accordance with the instructions provided to her and in violation of MDHS agency practice and standard operating procedures for handling disciplinary actions, that Ms. Schroeder had conducted herself in a manner lacking the professionalism and discretion expected of her MDHS Regional Director position, which constituted direct insubordination and put that agency at serious risk with her handling of a disciplinary matter and made a volatile situation even worse. . . .

*Id.* at 3–4.

In *Hager*, the plaintiff claimed that she was denied service at a Chili's restaurant operated by Brinker Texas, Incorporated, due to her race.  *Hager*, 102 F.4th at 695–96.  The restaurant at issue was in Rosenberg, Texas.  In an attempt to proffer a legitimate, non-discriminatory reason for the alleged denial of service, Brinker "submitted a declaration from Tristan Venable, a Brinker in-house human resources employee that it dispatched to Rosenberg to investigate Sharnez's potential claims several days after the incident.  Venable concludes in his declaration that racial discrimination played no part in the incident."  *Hager*, 102 F.4th at 701.  The Fifth Circuit held that the declaration was inadmissible because

(1) the declarant lacked personal knowledge because he "was not at the restaurant during the incident"; and (2) the business record exception to the hearsay rule did not apply to the declaration because it was "prepared immediately after the threat of [plaintiff's] litigation loomed . . . ." *Id.* at 702–03.

The *Hager* decision is distinguishable because McDonald was present when the decision to terminate Schroeder was made, and she was directly involved in the decision. Meanwhile, the *Hager* declaration was based on an investigation conducted by an in-house employee who traveled to the restaurant and conducted interviews of employees who were present when the alleged discrimination occurred. *Id.* at 696–97, 701–02. McDonald's declaration can be considered by the Court at the summary judgment stage because McDonald is competent to testify regarding MDHS's reason for terminating Schroeder and her testimony "is capable of being presented in a form that would be admissible in evidence" at trial. *D'Onofrio*, 888 F.3d at 208.

In addition, McDonald's recitation of the statements made by Kinnel and Cunningham is not presented in an effort to demonstrate that Kinnel and Cunningham's statements were truthful. She merely testified that those statements were the basis for her decision to terminate Schroeder. As a result, the statements included in her Declaration are not hearsay. *See Reed*, 908 F.3d at 120.

## B.    DRONE'S DEPOSITION

Schroeder argues that some of Drone's deposition testimony is inadmissible hearsay because she "said the only knowledge she had about any reason for

-11-

Schroeder's termination came from Kinnel or from 'other information that was not available to [her] at that time.'" Pl.'s Mem. [36] at 14 (quoting Drone Dep. [35-2] at 25). However, MDHS is not presenting Drone's testimony in an effort to show that Kinnel's statements regarding Schroeder were truthful. Drone testified that she and McDonald decided to terminate Schroeder based on statements Kinnel provided regarding Schroeder's alleged mishandling of Necaise's suspension notice. As a result, Kinnel's statements are not presented by Drone for the purpose of demonstrating that Schroeder actually committed the acts that led to her termination; they are presented "for the non-hearsay purpose of showing the defendants' state of mind in terminating" Schroeder. *See Davis v. AltaCare Corp.*, 291 F. App'x 645, 647 (5th Cir. 2008); *see also Coleman v. Jason Pharms.*, 540 F. App'x 302, 306 (5th Cir. 2013) (Unsworn statements attached to an affidavit were offered to prove what the employees had told a human resources officer, who relied on the statements when making the decision to terminate the plaintiff.).

"In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but "whether the employer reasonably believed the employee's allegation and acted on it in good faith." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010); *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993) ("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief."). Therefore, the question of whether Schroeder truly mishandled the delivery of

Necaise's suspension notice is not at issue in this Title VII case, and complaints made concerning Schroeder's conduct are not submitted for the truth of the matter asserted.

### C.    ALLEN'S DEPOSITION

Drone testified that she learned about Allen's allegations against Schroeder after Schroeder was terminated, so it did not impact her decision.  McDonald testified that Allen's complaints were a factor when she agreed with Drone that Schroeder should be terminated.  McDonald Decl. [30-1] at 3–4.

Schroeder argues, "To the extent that Defendant attempts to rely on Allen's testimony as cause for Schroeder's termination, large swaths of Allen's testimony is inadmissible hearsay or irrelevant and should not be considered for summary judgment."  Pl.'s Mem. [36] at 8.  Once again, the statements described by Allen during his deposition are not hearsay because they are not offered to prove the truth of the matter asserted.  He merely described the basis for his complaints about Schroeder.

As explained previously, the question of whether Allen's complaints were truthful is not before the Court.  The question is not whether MDHS made a correct decision when it terminated Schroeder.  It is whether MDHS terminated Schroeder due to her race.  *See Jackson*, 602 F.3d at 379.

### D.    EXHIBIT K, JANUARY 24, 2024, EMAIL CHAIN

Schroeder argues that Exhibit K to MDHS's Motion contains inadmissible hearsay.  This Exhibit contains statements made by Cunningham regarding her

telephone conversations with Necaise.  In the first telephone call, Cunningham

claims:

> • Johna Necaise stated that Rebecca Schroeder, with tears in her eyes, told her I hate to be the one to have to tell you this, but you are being put on administrative leave effective immediately & asked her [for] her badge & any other agency property she had on her.
> • Johna Necaise stated that Rebecca Schroeder told her that she is sure that Kristi Kinnel & Christy Blue were behind this as they hate Rebecca due to her kicking them out of Harrison County 8 months ago, and that this is them getting back at her because they know that Rebecca wants Johna as county director for Hancock County.
> • Johna Necaise stated that Rebecca Schroeder told her to ask who made the accusations against her.
> • Johna Necaise stated Rebecca said she was not informing Ziva Fox of Johna Necaise being on administrative leave due to Ziva Fox not letting Rebecca Schroeder know that state office was in Hancock County on Thursday, 1/18/2024.

Cunningham Statement [30-1] at 21 (errors in original).  Cunningham also provided

Fox with notes she took during a second phone call with Necaise.  In the second call,

Necaise allegedly told Cunningham that her suspension was based on retaliation

and racism.  Def.'s Mot., Ex. K [30-11] at 2.  Necaise also stated that she planned to

file a lawsuit, contact the media, the governor, and others to make complaints about

MDHS and its employees.  *Id.*

McDonald testified that she relied on Cunningham's notes from her first

phone call with Necaise when she decided to terminate Schroeder.  McDonald Decl.

[30-1] at 3; Ex. 4 to McDonald Decl. [30-1] at 21.  The Court has only considered the

portion of Cunningham's notes that was relied upon by McDonald when she decided

to terminate Schroeder.  Those notes were labeled as Exhibit 4 to McDonald's

Declaration.  The remainder of Cunningham's notes, which were contained in

Exhibit K to MDHS's Motion, are irrelevant to the question of whether Schroeder

was terminated due to her race.

## II.    MDHS'S MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment may be filed by any party asserting that

there is no genuine issue of material fact, and that the movant is entitled to prevail

as a matter of law on any claim.  Fed. R. Civ. P. 56.  "Where the non-movant bears

the burden of proof at trial, the movant may merely point to an absence of evidence,

which shifts to the non-movant the burden of demonstrating by competent

summary judgment proof that there is an issue of material fact warranting trial."

*Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 521 (5th Cir. 2025)

(citation modified).  "The non-movant cannot satisfy this burden merely by denying

the allegations in the opponent's pleadings but can do so by tendering depositions,

affidavits, and other competent evidence to buttress its claim."  *Id.*

Title VII provides that it is "an unlawful employment practice for an

employer . . . to discharge any individual . . . because of such individual's race[.]"  42

U.S.C. § 2000e-2(a)(1).  When considering a motion for summary judgment

concerning a race discrimination claim, "courts apply the *McDonnell Douglas*

burden-shifting framework."  *Stelly*, 149 F.4th at 521–22 (citing *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).

> Under this framework, the plaintiff bears the initial burden to
> establish a prima facie case of discrimination.  If successful, the burden
> of production shifts to the defendant to proffer a legitimate,
> nondiscriminatory reason for its action.  If the defendant meets that
> burden, the presumption of discrimination disappears, and the

> plaintiff must produce substantial evidence indicating that the defendant's proffered reason is pretext for discrimination.

*Ibanez v. Tex. A&M Univ. Kingsville*, 118 F.4th 677, 682–83 (5th Cir. 2024).

"Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402–03 (5th Cir. 2001).

> In making her showing on this ultimate question, the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination, and the factfinder may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom.

*Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001) (citation modified).

## A.    LEGITIMATE, NONDISCRIMINATORY REASON

"For purposes of summary judgment only, MDHS assumes Schroeder can establish a prima facie case."  Def.'s Mem. [31] at 12.  Therefore, the Court's first consideration is whether MDHS has met its burden of proffering a legitimate, nondiscriminatory reason for Schroeder's termination.  "To meet this burden, the employer must show, through admissible evidence, a legally sufficient reason for [terminating] the plaintiff."  *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 202 (5th Cir. 2008) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation modified).  Thus, the employer must "introduce evidence which, taken as

-16-

true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

In the present case, MDHS has proffered two reasons for Schroeder's termination:

> First, both McDonald and Drone fired Schroeder based on her serious infraction for handling the disciplinary notice, in violation of MDHS procedures for handling disciplinary actions, and in direct insubordination of her supervisor's instructions. In reaching her final decision to terminate Schroeder, McDonald further relied on Allen's report of Schroeder falsely claiming technological issues to assign blame for untimely work.

Def.'s Mem. [31] at 13. MDHS has produced admissible testimony from McDonald and Drone regarding these reasons. *See* McDonald Decl. [30-1] at 3–4; Drone Dep. [35-2] at 20–21. As a result, MDHS has satisfied its burden of proffering a non-discriminatory basis for terminating Schroeder.

## B.   PRETEXT

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc* , 333 F.3d 572, 578 (5th Cir. 2003) (citation modified). "A reason is unworthy of credence if it is not the real reason for the adverse employment action." *Watkins*, 997 F.3d at 284 (citation modified). "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Id.*

Schroeder first claims she "can point to sufficient evidence to show that

Defendant's proffered reason for termination is false." Pl.'s Mem. [36] at 21.

However, it is unclear which evidence Schroeder is referencing.

Next, Schroeder asserts that she "is entitled to a 'cat's paw' instruction related to Kinnel's influence over the termination decision." *Id.* at 21. The cat's paw theory recognizes that the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the decisionmaker acted as a rubber stamp, or the cat's paw, for the subordinate employee's prejudice. *Laxton*, 333 F.3d at 584. Thus, a court must "look to who actually made the decision or caused the decision to be made, not simply to who officially made the decision." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000). A plaintiff must submit evidence that establishes: "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (citation modified). The term "animus" "suggests at least some form of ill will, antagonism, or hostility." *Donnelly v. Acad. P'ships L.L.C.*, No. 23-10724, 2024 WL 1877043, at \*6 (5th Cir. Apr. 30, 2024) (citation modified) (quoting *Roque v. Natchitoches Par. Sch. Bd.*, 583 F. App'x 466, 467 (5th Cir. 2014) (Jolly, J., concurring)).

Schroeder relies on Drone's testimony that "Kinnel harbored animus toward [her]." Pl.'s Mem. [36] at 22. However, while Drone testified that Kinnel did not like Schroeder, she stated that Kinnel's dislike of Schroeder was not based on Schroeder's race. Drone Dep. [35-2] at 40, 51. Drone explained that Schroeder "got

on [Kinnel's] nerves." *Id.* at 40.

Schroeder also cites a memo requesting Schroeder's termination that Kinnel sent to McDonald, Pl.'s Mot., Ex. 13 [35-13],[7] and an email that Kinnel sent to someone in MDHS's human resources department memorializing the "details that [led] to the termination recommendation for Rebecca Schroeder." Pl.'s Mot., Ex. 12 [35-12]. Kinnel did not mention Schroeder's race in these communications. She merely explained that she recommended Schroeder's termination because Schroeder "did not follow the instructions provided as it related to delivering Johna with the Suspension with Pay documents." *Id.*

During her deposition, Schroeder was asked what events led to her termination and why she believes her termination was racially motivated. She responded, "I was unaware of any events leading to my termination. I never had any disciplinary actions. And the reason I feel that it was racially motivated is because of the environment change on the 10th floor in the policy unit under Kristi Kinnel's direction." Schroeder Dep. [35-1] at 45. She further explained:

> Under [Kinnel's] direction, all of the white people were either terminated, transferred to other departments *or they mysteriously left for whatever reason*, and they were replaced with black people who were friends with Kristi Kinnel and Kristine Jefferson, who had less experience and knowledge than the white people she had gotten rid of.

*Id.* at 46 (emphasis added). She also stated:

> Well, I just feel like it was -- whenever I was terminated unexpectedly, then I figured I was the next person on the 10th floor that she wanted

_____

[7] MDHS points out that "[t]he report of Schroeder's policy violation did not originate from Kinnel. The misconduct was initially reported by Mary Cunningham, an independent witness with no alleged racial animus[.]" Def.'s Mem. [39] at 10.

> Ms. Fox, which I know that she wanted Ms. Fox to have the position anyway.  So the only way she could fill that with Ziva Fox was to get rid of me.

*Id.* at 47 (errors in original).  However, Drone testified that Kinnel was not on the interview panel that selected Fox to replace Schroeder.  Drone Dep. [35-2] at 51.  She further testified that Kinnel did not have any influence over that decision.  *Id.*

Schroeder claims that about half of the fifteen employees on the tenth floor of MDHS's state office in Jackson, Mississippi, were Caucasian "when [she] worked up there on a daily basis[.]"  *Id.* at 52.  After Kinnel began working on the tenth floor, there was "only one white person left[.]"  *Id.*  She alleges, "Everybody else was mysteriously transferred or their job was made so difficult that they left on their own or transferred to other departments or whatever."  *Id.*  She testified that Clint Scoggins was terminated; Jamie Crapps was transferred to the IT department; and Patty Wallace was promoted to the Simpson County Director position.  *Id.* at 52–59.  She admitted that she "[doesn't] know what happened to the rest of them."  *Id.* at 52.

Schroeder's vague testimony does not tend to show that Kinnel had a discriminatory animus or that the basis for Schroeder's termination was race.  Schroeder merely speculates that Kinnel previously terminated or transferred several Caucasian employees due to their race because Kinnel replaced them with friends who are African American.  Schroeder was only able to recall the names of three Caucasian employees allegedly terminated or transferred by Kinnel, and she admits that one of those employees applied for a promotion because the position was

located closer to her home.  Schroeder's statements that other Caucasian employees were "mysteriously transferred" or "mysteriously left for whatever reason" do not support a finding of racial animus on the part of Kinnel.  These statements merely indicate that Schroeder does not know the reason for those transfers and departures.

Schroeder's subjective belief that her termination was racially motivated is insufficient to create an inference of discriminatory influence.  *See Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999); *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citation modified) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment.").  In the absence of evidence or testimony supporting a finding of discriminatory animus on the part of Kinnel, Schroeder cannot demonstrate pretext using the cat's paw analysis.

Schroeder claims that "[a] reasonable jury could also find that the lack of investigation into Schroeder's alleged misconduct is evidence of pretext."  Pl.'s Mem. [36] at 25.  In particular, Schroeder asserts that Drone and/or McDonald should have discussed Kinnel's allegations with her before deciding to terminate her.  These arguments are insufficient to survive summary judgment because Schroeder was required to "produce evidence permitting the jury to disbelieve that [her employer's] proffered reason was its true motivation."  *See Laxton*, 333 F.3d at 579.  For example, in *Laxton*, the Fifth Circuit found that the plaintiff had established pretext by showing that some of the employer's alleged reasons for terminating her

were false.  *Id.* at 579–81.  In addition, the *Laxton* plaintiff presented "other

evidence [that] undermined [the employer's] credibility."  *McLaughlin v. W & T*

*Offshore, Inc.*, 78 F. App'x 334, 338 (5th Cir. 2003) (citing *Laxton*, 333 F.3d at 579–

81 ).

Schroeder also cites the fact that Drone was not aware of one of the reasons

McDonald cites for terminating Schroeder, but the fact that Drone was aware of

fewer complaints made against Schroeder does not in and of itself establish pretext.

*See Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 431 (5th Cir.

2016) (citation modified) (noting that the Fifth Circuit has "never held that an

employer giving additional reasons" for termination supports an inference of

pretext).

In addition, Schroeder claims that Fox disrupted the workplace because

Necaise accused Fox of race discrimination prior to Necaise's suspension.  Schroeder

argues that she was treated differently than Fox and that Fox should have been

asked to deliver the notice of suspension to Necaise because she was Necaise's

supervisor.  Specifically, she asserts:

> Necaise's complaints were lodged against Ziva Fox, who was Necaise's
> director supervisor and replaced Schroeder as Regional Director.  If
> this situation with Necaise was truly the reason for Schroeder's
> termination, it stands to reason that Fox also "inflamed the workforce"
> and would suffer some consequence, but no, Fox was promoted instead.

Pl.'s Mem. [36] at 26.  However, there is no evidence or testimony supporting a

finding that the general circumstances surrounding Necaise's suspension were the

reason for Schroeder's termination.  MDHS presented testimony that its decision to

terminate Schroeder was based on a statement provided by Mary Cunningham, a person who has not been charged with discrimination by Schroeder. Cunningham relayed that Schroeder had made negative statements about MDHS and encouraged Necaise to appeal when she delivered the notice of suspension. Moreover, there is no evidence that Necaise's allegations against Fox were substantiated or that Fox made negative comments about MDHS administration or encouraged a co-worker or subordinate to file a complaint or appeal against MDHS.

As the Fifth Circuit has explained,

> [t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive. Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue. A dispute in the evidence concerning job performance does not provide a sufficient basis for a reasonable factfinder to infer that the proffered justification is unworthy of credence.

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (citation modified). Furthermore, "[m]anagement does not have to make proper decisions, only non-discriminatory ones. . . . Employment discrimination laws are not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

Schroeder has admitted that Drone is "[d]efinitely not[ ]" racist. Schroeder Dep. [35-1] at 78–79. And she has not claimed that McDonald, who is also Caucasian, was motivated by race. Furthermore, there is no evidence that either

McDonald, Drone, or Kinnel relied on Cunningham's allegations against Schroeder in bad faith as a pretext for discriminating against Schroeder based on her race. *See Waggoner*, 987 F.2d at 1166. In fact, Schroeder has not provided any evidence or testimony that tends to show that McDonald, Drone, or Kinnel made any statements or committed any actions motivated by race discrimination. As a result, Schroeder has not met her burden of demonstrating pretext.

### C.   MIXED-MOTIVE ANALYSIS

Schroeder argues that "the *McDonnell Douglas* methodology is not exclusive but is only one form of circumstantial evidence upon which a plaintiff may rely." Pl.'s Mem. [36] at 15. She asserts that the Court should consider whether her race was a motivating factor for her termination due to the following statutory language:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m). Thus, Schroeder appears to be asking the Court to apply the mixed-motive analysis to her claim. *See Stelly*, 149 F.4th at 526 (explaining that mixed-motive analysis "requires some showing that the protected characteristic was at least partially a motivating factor" for the adverse action).

> The mixed-motive analysis is conducted using a modified *McDonnell Douglas* test, under which, after a defendant has offered nondiscriminatory reasons for the adverse employment action, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that the defendant's reason, while true, is only one of the reasons for its conduct and that another motivating factor was the plaintiff's protected characteristic.

*Id.* at 525.  "[T]he mixed motive standard is typically important insofar as it determines the jury instructions."  *Id.*[8]

As explained previously, Schroeder has not established that her race was a motivating factor for her termination.  The mixed-motive analysis is therefore inapplicable to Schroeder's claims.

## CONCLUSION

While Schroeder has submitted evidence and testimony indicating that an unfortunate level of acrimony existed among MDHS's employees, she has not produced credible evidence or testimony establishing that the acrimony or her termination were based on race.  MDHS is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [30] Motion for Summary Judgment filed by Mississippi Department of Human Services is **GRANTED**, and this lawsuit is **DISMISSED WITH PREJUDICE**.  The Court will enter a separate final judgment as required by Fed. R. Civ. P. 58(a).

**SO ORDERED AND ADJUDGED** this the 20th day of May, 2026.

s/ *Louis Guirola, Jr.*

Louis Guirola, Jr.
United States District Judge

---

[8] Similarly, the Second Circuit has noted that the differences between single-motive and mixed-motive cases "are irrelevant at the summary judgment stage."  *Bart v. Golub Corp.*, 96 F.4th 566, 575 n.2 (2d Cir.), *cert. denied sub nom. The Golub Corp. v. Elaine Bart*, 145 S. Ct. 173, 220 L. Ed. 2d 30 (2024).  But "[t]he difference is still relevant to jury instructions."  *Id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–100 (2003)).